IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL ACTION NO. 5:15-CV-00119-RLV-DCK

| | |
|---|---|
| MICHAEL MUNOZ, | ) |
|       Plaintiff, | ) ) ) |
| v. | )   **ORDER** ) |
| SUNTRUST BANK, | ) ) |
|       Defendant. | ) ) |

**THIS MATTER IS BEFORE THE COURT** on Defendant SunTrust Bank's Motion to Dismiss made pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. [Doc. No. 4]. Because the parties' briefing is now complete, the Defendant's Motion is ripe for review. Accordingly, for the reasons discussed more thoroughly below, the Defendant's Motion to Dismiss is **GRANTED**.

### I. BACKGROUND

The Woodsmiths Company (hereinafter, "Woodsmiths") was a furniture manufacturing company incorporated under the laws of North Carolina, which operated in Lenoir, North Carolina until its business operations ceased because its "good name, credit, and operating capital" were spoiled by a fraudulent scheme involving one of its employees, her co-conspirators, and the alleged wrongdoing of SunTrust Bank (hereinafter, "Defendant" or "SunTrust"). [Doc. No. 1-1] at ¶ 3 (2015 Complaint). Plaintiff, Michael Munoz, was president of Woodsmiths and held a ninety-five percent (95%) equity stake in the company. [Doc. No. 1-1] at ¶¶ 3, 25 (2015 Complaint). Plaintiff was also a one-hundred percent (100%) equity shareholder of Whittier Group, Inc., a Nevada corporation that leased equipment to Woodsmiths. [Doc. No. 1-1] at ¶ 4 (2015 Complaint).

Whittier Group, Inc. ceased business operations when Woodsmiths "failed to make lease payments [and] failed to repay its loans" because of SunTrust's alleged failure "to refund [to Woodsmiths] fraudulently endorsed checks" that were associated with the illegal scheme, referenced above. [Doc. No. 1-1] at ¶ 4 (2015 Complaint). Further, Plaintiff was a member of Michael Munoz, LLC, and held a one-hundred percent (100%) stake in that company. [Doc. No. 1-1] at ¶ 5 (2015 Complaint). Michael Munoz, LLC, a North Carolina limited liability company, was a lender to Woodsmiths and ceased business operations when Woodsmiths "failed to repay its loans" as a result of the money lost due to its employee's check fraud[1] – thus, forcing Michael Munoz, LLC to default on a mortgage loan. [Doc. No. 1-1] at ¶ 5 (2015 Complaint).

This litigation evolved from the above-discussed losses, and the cause can be traced to the time when Woodsmiths hired Tamatha Hilton as the company's bookkeeper in 2007. [Doc. No. 1-1] at ¶ 6 (2015 Complaint). At that time, Tamatha Hilton was married to Jimmy Hilton. [Doc. No. 1-1] at ¶ 7 (2015 Complaint). Jimmy was previously married to Jacqueline Hilton. [Doc. No. 1-1] at ¶ 8 (2015 Complaint). Sometime in January 2007, Tamatha, Jimmy, and Jacqueline concocted a ruse to get rich quick – by defrauding Tamatha's employer, Woodsmiths. [Doc. No. 1-1] at ¶¶ 9, 21 (2015 Complaint). In order to carry out their ambitious plan, the trio decided the best way to proceed would be to create a phony bank account with SunTrust, then illegally divert hundreds of thousands of dollars' worth of Woodsmiths' income into the imposter account. [Doc. No. 1-1] at ¶ 9 (2015 Complaint). Evidently not realizing any of the (obvious) problems with their plot, the three partners set-off in pursuit of their fortune.

Jacqueline was tasked with being the face of the operation. She set in motion the first phase

---

[1] The Complaint does not explicitly allege that Woodsmiths failed to repay its loans to Michael Munoz, LLC as a result of its employee's illegal acts and the alleged wrongdoing of SunTrust; however, construing the allegations of the Complaint in favor of the *pro se* Plaintiff, the Court will regard these allegations as having been appropriately made.

by visiting SunTrust's Hudson Branch, where she opened a business banking account as "Jacqueline H. Hilton d/b/a Woodsmiths Furniture Company" (the "Account"). [Doc. No. 1-1] at ¶ 9 (2015 Complaint). Jacqueline represented to SunTrust that she was the owner of the sole proprietorship "Woodsmiths Furniture Company," a supposed furniture manufacturing company. [Doc. No. 1-1] at ¶ 9 (2015 Complaint). SunTrust, through its Hudson Branch agents, believed Jacqueline's representations and accepted, without the benefit of any supporting documentation, that she was the true owner/operator of the sole proprietorship doing business as "Woodsmiths Furniture Company." [Doc. No. 1-1] at ¶¶ 9-10 (2015 Complaint). By allowing Jacqueline to open the Account, SunTrust failed to adhere to a number of its internal operating procedures. [Doc. No. 1-1] at ¶¶ 11-12 (2015 Complaint).

Having serendipitously succeeded with phase one, the partners commenced the next phase of their operation. Utilizing her position as Woodsmiths' bookkeeper, Tamatha (illegally) intercepted checks meant for Woodsmiths. [Doc. No. 1-1] at ¶ 13 (2015 Complaint). These checks were then passed-off to either Jacqueline or Jimmy for deposit into the Account. [Doc. No. 1-1] at ¶ 13 (2015 Complaint). Tamatha then fraudulently altered Woodsmiths' business records to conceal their criminal enterprise. [Doc. No. 1-1] at ¶ 23 (2015 Complaint). Tamatha's fraudulent concealment prevented Woodsmiths from immediately discovering that its checks had been nefariously intercepted and diverted to the Account. [Doc. No. 1-1] at ¶¶ 23-24 (2015 Complaint).

Between 2007 and 2009, Tamatha and the gang intercepted and deposited a total of 167 checks meant for Woodsmiths, totaling a value "in excess of $655,000[.]" [Doc. No. 1-1] at ¶¶ 14, 21 (2015 Complaint). Some of the checks were made out to "Woodsmiths," "The Woodsmiths Company," or "Woodsmiths, Inc.," and others indicated a payee address different than the one associated with the Account. [Doc. No. 1-1] at ¶¶ 17-18 (2015 Complaint). SunTrust allowed these

checks to be deposited into the Account in violation of its internal policies. [Doc. No. 1-1] at ¶¶ 15-17, 19-20 (2015 Complaint). Indeed, SunTrust never discovered the criminality underlying the Account on its own; instead, Tamatha, Jimmy, and Jaqueline's improbable journey to riches and fortune continued unabated until it came off the rails in late-February 2009 when Plaintiff discovered their racket. [Doc. No. 1-1] at ¶ 25 (2015 Complaint).

On February 27, 2009, Plaintiff, in his capacity as president and an agent of Woodsmiths, contacted BB&T (his banking institution of choice) regarding his discovery of "two fraudulently endorsed checks that had been cleared by Sun Trust [sic]." [Doc. No. 1-1] at ¶ 25 (2015 Complaint). Through BB&T, Plaintiff, still acting in his official capacity as an agent for Woodsmiths, was then placed into contact with representatives from SunTrust and their "Enterprise Fraud Department." [Doc. No. 1-1] at ¶ 25 (2015 Complaint). In response to Plaintiff's prodding, SunTrust's Regional Operations Manager, Linda Frick, began an internal investigation, which revealed that fraud had been committed on the Account. [Doc. No. 1-1] at ¶ 26 (2015 Complaint). In March 2009, at the conclusion of her investigation, Ms. Frick met with Plaintiff and explained "how the [A]ccount was opened, who had opened the [A]ccount, and where the [A]ccount had been opened." [Doc. No. 1-1] at ¶ 28 (2015 Complaint). Ms. Frick "promised and assured" Plaintiff that all the proceeds from the fraud would be refunded by SunTrust after Plaintiff completed the "Fraudulent Endorsement Process" for each diverted check. [Doc. No. 1-1] at ¶ 28 (2015 Complaint). SunTrust closed the Account in March 2009. [Doc. No. 1-1] at ¶ 35 (2015 Complaint).

After initially contacting SunTrust, Plaintiff also contacted the Lenoir Police Department. [Doc. No. 1-1] at ¶¶ 34, 36 (2015 Complaint). An official criminal investigation ensued. [Doc. No. 1-1] at ¶¶ 34, 36 (2015 Complaint). As a result of the criminal investigation, Tamatha and her co-

conspirators were convicted on forty-three counts of criminal wrongdoing. [Doc. No. 1-1] at ¶ 53 (2015 Complaint). However, Plaintiff sought more than mere criminal justice against the wrongdoers – he, quite reasonably, desired that SunTrust return the stolen money. For that relief, however, he had to file suit.

On April 15, 2011, Woodsmiths filed a complaint in Caldwell County Superior Court, captioned *The Woodsmiths Company v. SunTrust Bank*. [Doc. No. 5-1] (2011 Complaint).[2] In the 2011 Complaint, claims were asserted against SunTrust for conversion, violation of ordinary care, claims to the stolen checks, failure to act in good faith, negligence, gross negligence, and unfair trade practices under North Carolina state law (hereinafter, the "Prior Action"). *See* [Doc. No. 5-1] (2011 Complaint). SunTrust removed the Prior Action to this Court, which then proceeded before the undersigned until the parties reached a settlement agreement after each filed multiple motions for summary judgment. *See*, *generally The Woodsmiths Co. v. SunTrust Bank*, 5:11-CV-00076-RLV-DSC. On August 21, 2012, the parties, through their corporate representatives, reached a complete settlement agreement of the claims against SunTrust. *Accord The Woodsmiths Co. v. SunTrust Bank*, 5:11-CV-00076-RLV-DSC, [Doc. No. 54] (Report of Mediator). A notice of dismissal, *with prejudice*, was filed in the civil action *The Woodsmiths Co. v. SunTrust Bank* on September 4, 2012. *See* [Doc. No. 5-3] (Stipulation of Dismissal); *accord The Woodsmiths Co. v. SunTrust Bank*, 5:11-CV-00076-RLV-DSC, [Doc. No. 55] (Stipulation of Dismissal).

Now, more than three years after filing the dismissal with prejudice in the Prior Action, Plaintiff has brought the instant suit against SunTrust in his *personal* capacity. His new complaint, while attempting to state new causes of action, recites, either in-whole or in-part, a swath of the

---

[2] The 2011 action was subsequently removed to this Court. *See*, *generally The Woodsmiths Co. v. SunTrust Bank*, 5:11-CV-00076-RLV-DSC. For purposes of the instant Motion, the Court takes judicial notice of the documents filed therein as matters of public record. *See Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

factual allegations from the Prior Action's complaint. *Compare* [Doc. No. 5-1] (2011 Complaint) *with* [Doc. No. 1-1] (2015 Complaint). In addition to the allegations from the Prior Action, which may be taken as background, Plaintiff has alleged a number of additional dealings he purportedly had with SunTrust representatives between 2009 and 2011. *See* [Doc. No. 1-1] at ¶¶ 33-51 (2015 Complaint).

So as not to get mired unnecessarily in the details of Plaintiff's new material allegations, the Court summarizes them as follows: (1) SunTrust engaged in a pattern and practice of deception in order to conceal the extent of the fraud perpetrated *personally* on Plaintiff; (2) SunTrust repeatedly gave Plaintiff the "run-around" regarding the process for retrieving the stolen money (e.g., continually requested that he complete a "Fraudulent Endorsement Process," which Plaintiff contends does not exist); (3) SunTrust requested that Plaintiff spend time and money completing 167 FDIC affidavits (i.e., one for each stolen check) in order to retrieve the stolen money;[3] and (4) SunTrust representatives intentionally sought to deceive Plaintiff into allowing the applicable statute of limitations to run on each check, so as to preclude liability in an almost certain to be filed civil lawsuit. *See* [Doc. No. 1-1] at ¶¶ 33-51 (2015 Complaint). Plaintiff's Complaint alleges no acts by SunTrust which occurred after the Prior Action was filed and settled.[4] Plaintiff claims that

---

[3] Plaintiff claims that he "spent in excess of 6,000 hours completing affidavits" on the fraudulent checks. [Doc. No. 1-1] at ¶ 47 (2015 Complaint). In his later filed opposition brief, the Plaintiff claims that only "4,000 hours" of his time was spent on this matter. [Doc. No. 8] at p. 1.

[4] While Plaintiff's opposition brief alleges that SunTrust's "fraud continues to this day" because it "has never issued a denial for each of the FDIC Affidavit[s] of Fraudulent Endorsement [SunTrust] caused Plaintiff to execute," this allegation does not satisfy the Court that SunTrust has committed additional harm subsequent to the resolution of the Prior Action. Chiefly, this allegation is contained in Plaintiff's opposition brief, not his Complaint; therefore, the Court is not required to consider it. *See, e.g., Kelly v. United States*, 2014 U.S. Dist. LEXIS 114376, at *15 (E.D.N.C. 2014) ("[A] plaintiff may not amend [his] complaint through argument in briefing." (citing *Bratcher v. Pharm. Prod. Dev. Inc.*, 545 F. Supp. 2d 533, 542 (E.D.N.C. 2008))); *accord Williams v. Guilford Tech. Cmty. Coll. Bd. of Trs.*, 2015 U.S. Dist. LEXIS 90221, at *11-12 (M.D.N.C. 2015) (same regarding *pro se* plaintiff); *Romanello v. Capital One Bank United States*, 2014 U.S. Dist. LEXIS 164557, at *10 (E.D.N.C. 2014) (same). Moreover, even if the Court were to consider this allegation, Defendant was not required to take any further action with regard to Plaintiff once the settlement agreement and dismissal were reached in the Prior Action, as SunTrust's relationship with Woodsmiths (and apparent legal liability) had been terminated *with prejudice*. *See* [Doc. No. 5-3] (Stipulation of Dismissal); *accord The Woodsmiths Co. v. SunTrust Bank*, 5:11-CV-00076-RLV-DSC, [Doc. No. 55] (Stipulation of Dismissal). Thus,

these newly-alleged interactions created a confidential relationship between SunTrust and Plaintiff, *personally*, that Plaintiff relied upon SunTrust's representations to his detriment, and that SunTrust's deceptive practices caused him to lose money invested in Woodsmiths, lose money owed to and by Woodsmiths, and to allocate time and resources to recover the stolen money. *See*, *e.g.*, [Doc. No. 1-1] at pp. 20-29 (2015 Complaint).

On September 28, 2015, Defendant SunTrust filed its Motion seeking a dismissal of the Complaint under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. [Doc. No. 4]; [Doc. No. 5]. Defendant argues that Plaintiff's Complaint should be dismissed for a variety of reasons; however, most compellingly, Defendant argues that the Complaint should be dismissed for lack of standing. [Doc. No. 5] at pp. 5-9. Because the Defendant has properly raised a standing issue, and because the Court agrees that Plaintiff has no standing to pursue this lawsuit, the Court finds that it must dismiss the Complaint and, therefore, does not reach any of the other issues raised by Defendant's Motion.

## II.   DISCUSSION

### A.   Standard of Review

When reviewing a Rule 12(b)(6) motion to dismiss, this Court must examine the legal sufficiency of the complaint; it may not resolve factual disputes or weigh the claims and defenses against one another. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Rather, the court must accept as true all of the well-plead factual allegations contained in the complaint. *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). A court may, however, determine whether the facts alleged are sufficient, when taken at face-value, to reasonably imply

---

Plaintiff's assertion that SunTrust has not "to this day . . . issued a denial" of his affidavits misses any identifiable mark of legal significance. In addition, Plaintiff has not sufficiently plead facts which show how the Defendant's failure to "issue a denial for each" affidavit has caused him any harm. His allegations of harm, as they relate to this issue, are conclusory and diffuse.

liability on the part of the defendant. In order to survive such a motion, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible when the factual content allows for the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*

However, a pleading that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678. In order to assert a claim for relief, the complaint must allege facts that imply more than a "sheer possibility that a defendant has acted unlawfully" or "facts that are 'merely consistent with' a defendant's liability[.]" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557). Critically, "'[t]he presence . . . of a few conclusory legal terms does not insulate a complaint from dismissal . . . when the facts alleged in the complaint' cannot support the legal conclusion" alleged or the relief sought. *See Migdal v. Rowe Price-Fleming Int'l*, 248 F.3d 321, 326 (4th Cir. 2001) (quoting *Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001)). "Legal inferences drawn from the facts, unwarranted inferences, unreasonable conclusions, or arguments are not part of the [court's] consideration." *Dolgaleva v. Va. Beach City Pub. Sch.*, 364 Fed. App'x 820, 827 (4th Cir. 2010); *see also Eastern Shore Mkts., Inc. v. J.D. Assocs. LLP*, 213 F.3d 175, 180 (4th Cir. 2000).

In applying this standard, the Supreme Court has reiterated that "[a] document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal citations and quotation marks omitted); *Dolgaleva*, 364 Fed. App'x at 827.

However, the Fourth Circuit has "not read *Erickson* to undermine *Twombly's* requirement that a pleading contain more than labels and conclusions[.]" *Giarratano v. Johnson*, 521 F.3d 298, 304 n.5 (4th Cir. 2008) (internal quotation marks omitted) (applying *Twombly* standard in dismissing *pro se* complaint); *accord Atherton v. Dist. of Columbia Off. of Mayor*, 567 F.3d 672, 681-82 (D.C. Cir. 2009) ("A *pro se* complaint . . . 'must be held to less stringent standards than formal pleadings drafted by lawyers.' But even a *pro se* complainant must plead 'factual matter' that permits the court to infer 'more than the mere possibility of misconduct.'" (quoting *Erickson*, 551 U.S. at 94; *Iqbal*, 556 U.S. at 679)); *accord Pickens v. JP Morgan Chase Bank, N.A.*, 2016 U.S. Dist. LEXIS 62911, at *7-10 (W.D.N.C. May 12, 2016) (Voorhees, J.); *Silvers v. Iredell Cty. Dep't of Soc. Servs.*, 2016 WL 427953, at *7 (W.D.N.C. Feb. 3, 2016) (Voorhees, J.). The rules governing the generous construction of *pro se* pleadings "do[] not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based." *Ashby v. City of Charlotte*, 2015 U.S. Dist. LEXIS 103286, at *4 (W.D.N.C. 2015); *Godfrey v. Long*, 2012 U.S. Dist. LEXIS 2671, at *3-4 (E.D.N.C. 2012) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)); *see also Silvers*, 2016 WL 427953, at *7.

  B.  <u>Preliminary Matter</u>

Before discussing the merits of the Defendant's standing challenge, the Court finds it appropriate to discuss the general posture of its review of that issue. Defendant moved to dismiss Plaintiff's Complaint on general standing grounds. *See* [Doc. No. 5]. However, Defendant did not explicitly specify whether it moved to dismiss based upon constitutional standing (i.e., Article III "case or controversy" jurisdictional standing) or prudential standing, which is non-constitutional, non-jurisdictional, and a self-imposed constraint upon the judiciary's exercise of its Article III powers. *See*, *e.g.*, *Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990).

The gravamen of Defendant's argument contends that Plaintiff lacks standing based upon the so-called "shareholder standing" rule, which is a prudential restriction on standing – not a constitutional limitation. *Id.*; *accord Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (acknowledging that prudential standing encompasses "the general prohibition on a litigant's raising another person's legal rights [and] the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches . . . ."), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, ___ U.S. ___, 134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014).

Defendant contends that its "shareholder standing" argument is jurisdictional in nature and requests that this Court dismiss Plaintiff's Complaint for lack of subject matter jurisdiction. *See* [Doc. No. 5] at pp. 5-6. However, as is shown above, this argument is incorrect. Construed correctly, Defendant's Motion *assumes* this Court has subject matter jurisdiction to consider its prudential standing argument and, as a result, fails to address whether Article III standing exists respecting Plaintiff's claims. This Court has "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *See Dogs-By-Andy K-9 Servs., LLC v. Sherwin-Williams Co.*, 2015 U.S. Dist. LEXIS 146243, at *3 (W.D.N.C. 2015) (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 501 (2006)). The Fourth Circuit has consistently held that "before a federal court can decide the merits of a claim, the claim must invoke the jurisdiction of the court." *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006). "A court is to presume, therefore, that a case lies outside its limited jurisdiction unless and until jurisdiction has been shown to be proper." *United States v. Poole*, 531 F.3d 263, 274 (4th Cir. 2008); *Md. Stadium Auth. v. Ellerbe Becket, Inc.*, 407 F.3d 255, 260 (4th Cir. 2005). And, as a general matter, a court may not assume such jurisdiction exists in order to reach other, more palatable issues. *See*,

*e.g.*, *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998) (citing *Ex Parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)).

Nevertheless, the Court's review of Defendant's Motion is not constrained by its failure to address jurisdictional standing. Prudential standing is an inquiry into the appropriateness of the Court's exercise of its Article III powers in light of the facts before it – *albeit*, it is not mandatory, like the constitutional-based inquiry. *See*, *e.g.*, *Kowalski v. Tesmer*, 543 U.S. 125, 128-29 (2004); *United States v. Day*, 700 F.3d 713, 721 (4th Cir. 2012) ("Unlike Article III standing, issues of prudential standing are non-jurisdictional and may be pretermitted in favor of a straightforward disposition on the merits."). However, because prudential standing asks whether it is *appropriate* to exercise federal judicial authority, such an analysis does not reach the *substantive merits* of the pending action. *See*, *generally Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005); *accord Newdow*, *supra*, at 17-18 (declining to reach the merits of the case because the noncustodial parent plaintiff "lack[ed] prudential standing to bring th[e] suit in federal court"). Consequently, prudential standing is a non-merits-based inquiry and the Court, like Defendant, may *assume* Article III standing exists in this case so as to reach the similar "threshold question" of prudential standing. *See*, *e.g.*, *Tenet*, 544 U.S. at 6 n.4; *Kowalski*, 543 U.S. at 128-29 (assuming Article III standing in order to consider whether prudential grounds for standing exist); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999) (distinguishing *Steel Co.* and finding that a federal court does not exceed its Article III authority by assuming constitutional standing and considering whether dismissal of an action is otherwise appropriate based upon other, non-merits-based considerations). Thus, assuming the Complaint's claims trigger Article III standing, the Court may consider the Defendant's request for a determination as to whether Plaintiff has prudential standing to continue this litigation.

C.  Plaintiff Does Not Have Prudential Standing

Interpreting North Carolina law,[5] the Fourth Circuit has held that an individual plaintiff lacks the requisite prudential standing to assert claims in federal court that are derivative of harm caused by third parties to a corporate entity. *See Smith Setzer & Sons, Inc. v. South Carolina Procurement Review Panel*, 20 F.3d 1311, 1317 (4th Cir. 1994); *see also Rivers v. Wachovia Corp.*, 665 F.3d 610, 614-15 (4th Cir. 2011); *accord Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 488 S.E.2d 215, 219 (N.C. 1997); *Dawson v. Atlanta Design Associates, Inc.*, 144 N.C. App. 716, 551 S.E.2d 877, 879-80 (N.C. Ct. App. 2001). Specifically, a corporate "shareholder – even [a] sole shareholder – does not have standing to assert claims alleging wrongs to the corporation." *Smith Setzer*, 20 F.3d at 1317 (internal quotations omitted); *see also Rivers*, 665 F.3d at 614-15 ("Under . . . North Carolina . . . law, [t]he well-established general rule is that shareholders cannot pursue individual causes of action against third parties for wrongs or injuries to the corporation . . . ." (internal quotation and citations omitted)).

Indeed, this rule is "fundamental," *Smith Setzer*, 20 F.3d at 1317, because it protects the interests of *all* stockholders who suffer a common injury instead of promoting piecemeal litigation

---

[5] Though standing inevitably impugns upon issues of federal authority, the necessary predicate for challenging (or, alternatively, asserting) standing in the diversity context typically finds its basis in state law. *See General Technology Applications, Inc. v. Exro Ltda*, 388 F.3d 114, 118 (4th Cir. 2004) ("In a diversity case, [the court] must consult state law to determine the nature of the litigant's rights and whether he is entitled to assert the claims he makes. A litigant bringing a diversity action (or seeking removal on that basis) can have no greater ability to assert legal rights created under state law than it would have in the state forum." (internal citation omitted)); *Smith Setzer & Sons, Inc. v. South Carolina Procurement Review Panel*, 20 F.3d 1311, 1317 (4th Cir. 1994) (looking to North Carolina law to determine whether prudential standing exists under the "shareholder standing" doctrine where the relevant corporate entity was incorporated in North Carolina); *but see White v. Nat'l Union Fire Ins. Co.*, 913 F.2d 165, 167 (4th Cir.1990) (("Federal standards guide the inquiry as to the propriety of declaratory relief in federal courts, even when the case is under the court's diversity jurisdiction."). To determine if a "shareholder's claims are derivative of the corporation's claims for standing purposes" and thus barred by the "shareholder standing" doctrine, courts "apply the law of the state of incorporation." *See Termorio S.A., E.S.P. v. Electrificadora Del Atlantico S.A., E.S.P.*, 421 F.Supp.2d 87, 92 (D.D.C. 2006) (citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108–09 & n. 10 (1991)); *accord Smith Setzer & Sons, Inc.*, 20 F.3d at 1317 (following North Carolina's "shareholder standing" doctrine because that is the state in which the relevant corporate entity was incorporated). Accordingly, the Court must look to North Carolina state law formulations of the "shareholder standing" doctrine to determine whether federal prudential considerations require that Plaintiff's claims be dismissed upon standing grounds.

by individual investors at the expense of other similarly-situated shareholders. *See Rivers*, 665 F.3d at 615. Thus, where a corporate harm has occurred, it is presumed that an individual shareholder may not pursue an individual claim to recover for that harm. *Smith Setzer*, 20 F.3d at 1317; *Rivers*, 665 F.3d at 615. Where "the gravamen of [the] complaint is an injury to the corporation and not to the individual interest of the shareholder," the law generally prohibits individual suits to recover for individual harm that results from the decline in the corporation's stock value. *Rivers*, 665 F.3d at 615.

Here, the gravamen of the action is that Plaintiff, in his official capacity as a representative of Woodsmiths, contacted SunTrust about a bank fraud concerning *Woodsmiths'* checks, funds, and name. Though Plaintiff alleges that Defendant was purportedly on notice that *his individual identity* was the subject of the fraud, this allegation is a mere conclusory and general statement that is contradicted by the vast amount of other, more specific, allegations, which clearly show that the fraudulent account and stolen funds concerned Woodsmiths directly – not Plaintiff, individually. Without doubt, the Complaint's allegations show that all of Plaintiff's claims arise directly from the facts surrounding the fraud perpetrated on Woodsmiths; such as for example, the stolen money itself, SunTrust's purported failure to return the money, and Woodsmiths financial troubles that followed. None of these allegations allege an *individual* harm to Plaintiff that is *more than* his derivative harm as a shareholder in the corporate entity he founded. Thus, Plaintiff is presumptively barred, on prudential standing grounds, from pursuing the claims asserted in his Complaint. *See Smith Setzer*, 20 F.3d at 1317; *Rivers*, 665 F.3d at 615.

Because North Carolina law presumptively bars a litigant from personally recovering on claims that arise out of a harm to a corporation in which the litigant is (or was) a shareholder, such an individual must show that his or her claims fall within an applicable exception to the general

rule in order to gain prudential standing in federal court. And therein lies the rub; the recognized exceptions to this rule are few and fixed. To qualify under an exception recognized by North Carolina law, a shareholder plaintiff must show either: (1) that the third-party "bad actor" owed him or her an individualized "special" duty; or (2) that he or she suffered an injury "separate and distinct" from that suffered by the other shareholders or the corporation itself (i.e., that his or her claim is *more than* simply a derivative loss). *See Rivers*, 665 F.3d at 617-20; *accord Barger*, 488 S.E.2d at 220; *Howell v. Fisher*, 49 N.C. App. 488, 272 S.E.2d 19, 23 (N.C. Ct. App. 1980). Plaintiff has failed to demonstrate either.

With respect to the "special duty" exception, Plaintiff has failed to allege facts that create a triable issue regarding whether SunTrust owed Plaintiff an individual duty different from the duty owed to Woodsmiths. To support the right to an individual lawsuit by a corporate shareholder, the "special" duty owed by the third party must be one owed directly to the complaining plaintiff, and it must be distinct from the general duties owed by the third party to the corporation itself or to all shareholders collectively. *See Gaskin v. J.S. Procter Co., LLC*, 196 N.C. App. 447, 675 S.E.2d 115, 120 (N.C. Ct. App. 2009) (citing *Barger*, 488 S.E.2d at 220); *Dawson v. Atlanta Design Assocs., Inc.*, 144 N.C. App. 716, 551 S.E.2d 877, 879-880 (N.C. Ct. App. 2001). Here, the closest Plaintiff comes to alleging a "special" duty is his allegation that SunTrust entered a fiduciary relationship with him, individually, when he contacted Ms. Frick and she "promised and assured" Plaintiff that all the proceeds from the fraud would be refunded by SunTrust. *See* [Doc. No. 1-1] at ¶¶ 26-28 (2015 Complaint). Although Plaintiff adamantly contends that this interaction constituted an individual fiduciary relationship between himself and SunTrust, this is, at most, a conclusory legal assumption that is entitled to no weight. *See*, *e.g.*, *Migdal*, 248 F.3d at 326 ("The presence . . . of a few conclusory legal terms does not insulate a complaint from dismissal . . . when

the facts alleged in the complaint cannot support [the] legal conclusion . . . ."); *accord Iqbal*, 556 U.S. at 678.

Nevertheless, to the extent a fiduciary relationship *did arise*, it was entered into *only* between *Woodsmiths* and *SunTrust*. This is so because none of the parties' interactions were based on Plaintiff's *individual* circumstances – specifically, there are no allegations that any representations or promises were made by SunTrust to Plaintiff *outside* the context of him reaching out to SunTrust as an officer and shareholder of Woodsmith regarding Woodsmiths' troubles. *See Investors Fund, L.P. v. Metric Constructors, Inc.*, 351 N.C. 331, 525 S.E.2d 441, 444 (N.C. 2000); *see also Rivers*, 665 F.3d at 617-18. To be sure, Plaintiff contacted SunTrust as *Woodsmiths'* president regarding a fraud *on Woodsmiths*; he did *not* initiate contact with SunTrust in his own capacity *vis-à-vis* a fraud on himself. *See*, *e.g.*, [Doc. No. 1-1] at ¶ 25 (2015 Complaint) ("Plaintiff contacted SunTrust . . . as the President of Woodsmiths . . . ."). Additionally, Plaintiff's dealings with SunTrust involved the Defendant's "Enterprise Fraud Department" – a department tasked with uncovering commercial fraud, not fraud to a private individual's accounts. *See* [Doc. No. 1-1] at ¶ 25 (2015 Complaint). As president of Woodsmiths, Plaintiff was dealing with SunTrust in his official capacity on behalf of all of Woodsmiths' shareholders, and about a predicament that affected the shareholders' investment. Such circumstances are insufficient to show that an individualized "special duty" existed between SunTrust and Plaintiff, and therefore this exception is inapplicable.

Moreover, Plaintiff has failed to demonstrate that he suffered a personal loss that was not derivative of his relationship with Woodsmiths. Plaintiff claims that he has lost out on money invested in Woodsmiths, owed to and by Woodsmiths, and time and money spent trying to recover the money fraudulently stolen from Woodsmiths. *See* [Doc. No. 1-1] at pp. 20-29 (2015

Complaint). However, it is clear on its face that all of these purported losses arose from the Plaintiff's status as a shareholder and officer of Woodsmiths, or as a creditor to Woodsmiths. *See, e.g.*, *Green v. Freeman*, 367 N.C. 136, 749 S.E.2d 262, 269 (N.C. 2013) (applying the same standing rule to corporate creditors as is applicable to corporate shareholders).[6] It is well-established that corporations may only act through their agents and, under circumstances such as those at bar, it is fair to assume that a high-ranking officer, such as Plaintiff, is acting in his agency capacity. *See Lexis-Nexis, Div. of Reed Elsevier, Inc. v. Travishan Corp.*, 155 N.C. App. 205, 573 S.E.2d 547, 549 (N.C. Ct. App. 2002). As the complaint shows, Plaintiff was, indeed, acting *as an agent of Woodsmiths* while attempting to recover the funds from SunTrust. *See, e.g.*, [Doc. No. 1-1] at ¶ 25 (2015 Complaint). Thus, any costs he incurred while attempting to do so resulted from that corporate relationship, and were therefore personal to *Woodsmiths* – not Plaintiff. *See* N.C. Gen. Stat. § 55-8-42(a) (requiring corporate officers to act in "good faith," with reasonable care, and in the best interests of the corporation). Further, Plaintiff alleges he was harmed because the fraud caused his Woodsmiths' investment to be depleted. This allegation is a *per se* derivative loss that Plaintiff cannot now recover in an individual lawsuit. *See, e.g.*, *Estate of Browne v. Thompson*, 219 N.C. App. 637, 727 S.E.2d 573, 575-76 (N.C. Ct. App. 2012). As a result, Plaintiff has utterly failed to allege a harm that is "separate and distinct" from that which SunTrust allegedly caused

---

[6] The Court finds that Plaintiff's allegations that his other corporations lost out on money lent to Woodsmiths because of the fraud falls under this "creditor" case law. In addition, Plaintiff would be seeking to recover those losses as a member and shareholder of those corporations, not in his personal capacity – thus, the shareholder standing rule would *still* apply. In any event, however, were the Court to analyze these allegations further, it would be hard pressed to find that Article III standing exists for the alleged injuries to those ancillary companies because Plaintiff alleges harm that is at least three-steps-removed from the fraud that occurred to Woodsmiths. *See, e.g.*, *Spokeo, Inc. v. Robbins*, ___ U.S. ___, ___, 136 S.Ct. 1540, 1547, 2016 U.S. LEXIS 3046, at *12, 2016 WL 2842447, at *5 (2016) (To satisfy Article III standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) *that is fairly traceable to the challenged conduct of the defendant*, and (3) that is likely to be redressed by a favorable judicial decision." (emphasis supplied)); *cf. VP Props. & Devs., LLLP v. Seneca Specialty Ins. Co.*, 2016 U.S. App. LEXIS 4614, at *7 (11th Cir. 2016) (finding injury too far removed for constitutional standing purposes where standing depended upon a third party winning a lawsuit, the third party being able to collect from the plaintiffs, and another third party being unable or unwilling to indemnify the plaintiffs).

to Woodsmiths, its shareholders, and agents. Accordingly, the second exception has no application here.

Because Plaintiff has failed to allege an exception to the shareholder standing rule, and because all of the facts on which Plaintiff grounds his claims are facts that show direct harm to Woodsmiths and only derivative harm to Plaintiff, the Court finds that Plaintiff has failed to allege facts supporting prudential standing to pursue this lawsuit. As a consequence, the Court must dismiss the Complaint in its entirety.

### III.    DECRETAL

**IT IS, THEREFORE, ORDERED THAT**

(1)    Defendant's Motion to Dismiss (Doc. No. 4) is hereby **GRANTED**;

(2)    The Plaintiff's Complaint (Doc. No. 1-1) is hereby **DISMISSED**; and

(3)    The Clerk shall administratively terminate this case.

**SO ORDERED**.

Signed: June 3, 2016

Richard L. Voorhees
United States District Judge